IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| THE CINCINNATI CASUALTY COMPANY,<br><br>    *Plaintiff*,<br><br>v.<br><br>EUGENE WELSH,<br><br>    *Defendant*. | Civil Action No. 2:24-cv-1245<br><br>Hon. William S. Stickman IV |

**MEMORANDUM OPINION**

WILLIAM S. STICKMAN IV, United States District Judge

  Plaintiff The Cincinnati Casualty Company ("Cincinnati") filed this lawsuit against Defendant Eugene Welsh ("Welsh") on September 3, 2024. (ECF No. 1). Cincinnati claims that Welsh has refused to appoint an appraiser and proceed to the appraisal process pursuant to the appraisal policy provision in an Executive Capstone homeowner's insurance policy (the "Policy") issued by Cincinnati to Welsh. Cincinnati has moved for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c). (ECF No. 14). The Court holds that Welsh has no valid reason to avoid participating in the appraisal process, especially since Cincinnati does not dispute that it owes Welsh full replacement coverage. Cincinnati's motion will be granted.

  **I.**  **STANDARD OF REVIEW**

  Pursuant to Federal Rule of Civil Procedure 12(c) ("Rule 12(c)"), once the pleadings are closed, but within such time as to not delay trial, a party may move for judgment on the pleadings. Fed. R. Civ. P. 12. A party may use a motion for judgment on the pleadings under

1

Rule 12(c) as a vehicle for raising several of the defenses enumerated in Federal Rule of Civil Procedure 12(b) ("Rule 12b"). *Turbe v. Gov't of Virgin Islands*, 938 F.2d 427, 428 (3d Cir. 1991). The standard of review is identical to that of a motion to dismiss under Rule 12(b)(6).[1] The only difference is that, on a motion for judgment on the pleadings, a court reviews not only the complaint, but also the answer and written instruments attached to the pleadings. *Iseley v. Talaber*, Civil Action No. 1:05-cv-444, 2008 WL 906508, at *2 (M.D. Pa. Mar. 31, 2008) (citation omitted). A court should consider the allegations in the pleadings, the exhibits attached thereto, matters of public record, and "undisputedly authentic" documents if the plaintiff's claims are based on such documents. *See Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196-97 (3d Cir. 1993); *see also Mele v. Fed. Reserve Bank of N.Y.*, 359 F.3d 251, 256 n.5 (3d Cir. 2004) (providing that a court may consider (1) exhibits attached to the complaint, (2) matters of public record, and (3) all documents that are integral to or explicitly relied upon in the complaint, even if they are not attached thereto, without converting the motion into one for summary judgment). However, because a Rule 12(c) "motion calls for an assessment of the merits of the case at an embryonic stage, the court must view the facts contained in the pleadings in the light most favorable to the nonmovant and draw all reasonable

---

[1] A plaintiff must allege sufficient facts that, if accepted as true, state a claim for relief plausible on its face. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The "plausibility" standard required for a complaint to survive a motion to dismiss is not akin to a "probability" requirement but asks for more than sheer "possibility." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556). In other words, the complaint's factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations are true even if doubtful in fact. *Twombly*, 550 U.S. at 555. Facial plausibility is present when a plaintiff pleads factual content that allows the court to draw the reasonable inference that a defendant is liable for the misconduct alleged. *Iqbal*, 556 U.S. at 678. Even if the complaint's well-pleaded facts lead to a plausible inference, that inference alone will not entitle a plaintiff to relief. *Id.* at 682. The complaint must support the inference with facts to plausibly justify that inferential leap. *Id.*

inferences therefrom" in the nonmovant's favor. *R.G. Fin. Corp. v. Vergara-Nunez*, 446 F.3d 178, 182 (1st Cir. 2006).

When a Rule 12(c) motion is not used to raise Rule 12(b) defenses, judgment on the pleadings under Rule 12(c) is not appropriate "'unless the movant clearly establishes that no material issue of fact remains to be resolved and that he is entitled to judgment as a matter of law.'" *CoreStates Bank, N.A. v. Huls Am., Inc.*, 176 F.3d 187, 193 (3d Cir. 1999) (quoting *Kruzits v. Okuma Machine Tool, Inc.*, 40 F.3d 52, 54 (3d Cir. 1994)). Motions under Rule 12(c) that are not used to raise certain Rule 12(b) defenses require a determination on the merits of the case and "should be granted only where it is clear that the merits of the controversy can be fairly and fully decided in such a summary manner." *In re Dreyfus Mut. Funds Fee Litig.*, 428 F. Supp. 2d 357, 358 (W.D. Pa. 2006).

## II.   FACTUAL AND PROCEDURAL BACKGROUND

Cincinnati is an insurance company incorporated in Ohio, maintaining its principal place of business in Fairfield, Ohio. (ECF No. 1, ¶ 3). Welsh is an individual who resides in Sewickley, Pennsylvania. (*Id.* ¶ 4). A fire occurred at Welsh's Sewickley residence on February 1, 2023, destroying the dwelling and other structures on the property. (ECF No. 23, p. 1). The property was insured by a Cincinnati-issued Policy, number H01 1075979, effective March 9, 2022 to March 9, 2023. (ECF No. 1, ¶ 8). The Policy provided Dwelling Coverage with a $1,825,000 insurance limit and Other Structures Coverage with a $365,000 insurance limit. (*Id.* ¶ 9). Cincinnati amended the Policy by endorsement, increasing the Dwelling Coverage limit to $2,399,000 and the Other Structures Coverage limit to $479,800. (ECF No. 23, p. 2); (ECF No. 11-1, p. 2). The Policy contains the following appraisal provision:

3

**6. Appraisal**

If "you" and "we" fail to agree on the amount of "physical loss", either may demand an appraisal of the "physical loss". In this event, each party will choose a competent and impartial appraiser within 20 days after receiving a written request from the other. The two appraisers will choose an umpire. If they cannot agree upon an umpire within 15 days, "you" or "we" may request that the choice be made by a judge of a court of record in the state where the "residence premises" is located. The appraisers will separately set the amount of "physical loss". If the appraisers submit a written report of an agreement to "us", the amount agreed upon will be the amount of "physical loss". If they fail to agree, they will submit their differences to the umpire. A decision agreed to by any two will set the amount of "physical loss". Each party will:

a. Pay its own appraiser; and

b. Bear the other expenses of the appraisal and umpire equally.

(ECF No. 1-2, p. 33).

The Policy also includes Guaranteed Replacement Cost Coverage, which increases the Policy's limit for Dwelling Coverage to equal the replacement cost of the dwelling if the amount of loss is greater than the Dwelling Coverage insurance limit. (ECF No. 15, p. 5); (ECF No. 1-2, pp. 22-23). Following the fire at Welsh's home, Cincinnati accepted coverage for the loss and has paid Welsh $2,520,891.17 to date under the Policy's Dwelling and Other Structures Coverages. (ECF No. 1, ¶ 13). Welsh presented a bid for reconstruction of the property estimating the replacement cost to be $3,251,761. (*Id.* ¶ 14). Cincinnati disputes this amount. (*Id.* ¶15). On June 5, 2024, Cincinnati demanded an appraisal regarding this dispute over the amount of physical loss to the property pursuant to the Policy's Appraisal provision. (*Id.* ¶ 17). Cincinnati proceeded to select Joseph Kriner of Young & Associates, Inc. as its appraiser. (*Id.* ¶ 18). Welsh has yet to name an appraiser, declining to proceed with the appraisal process. (*Id.* ¶ 19).

Cincinnati filed its declaratory judgment complaint on September 3, 2024, seeking a declaration that Welsh must appoint an appraiser as required by the Policy's Appraisal provision and a Court directive to proceed to appraisal to determine the actual amount of loss to Welsh's property. (ECF No. 14, ¶ 1); (ECF No. 1). Welsh filed an Answer, including a Counterclaim (ECF No. 11), on November 25, 2024, consisting of one count of bad faith against Cincinnati. Cincinnati filed its Answer to Welsh's Counterclaim (ECF No. 12) on December 9, 2024. Cincinnati then filed a Motion for Judgment on the Pleadings on January 8, 2025, asking the Court to hold that the facts in the parties' pleadings establish that there is a disagreement as to the amount of loss to Welsh's property, and that this disagreement must be resolved via the appraisal process. (ECF No. 15, p. 5).

### III. ANALYSIS

**A. Declaratory relief is warranted as the Policy's Appraisal provision is the appropriate mechanism to resolve the parties' dispute regarding the total amount of loss and replacement costs.**

"Appraisal clauses in insurance contracts are enforceable and recognized under Pennsylvania law as favored alternative dispute resolution mechanisms." *Keystone Asset Mgmt. Inc. v. W. Am. Ins. Co.*, No. CIV.A. 10-CV-02088, 2010 WL 4159249 at *3 (E.D. Pa. Oct. 22, 2010); *see also Santora v. Commercial Union Ins. Co.*, 1998 WL 83966 (E.D. Pa. Feb. 26, 1998).[2] To invoke the appraisal provision of an insurance policy, the insurer must admit liability and there must be a dispute only as to the dollar amount of the loss. *Id.* (citing *Kester v. State Farm Fire and Cas. Co.*, 726 F. Supp. 1015, 1017 (E.D. Pa. 1989)). Further, under Pennsylvania law, once there is a dispute over the amount of loss and either party demands appraisal, the

---

[2] Welsh's exact policy is "The Cincinnati Casualty Company Executive Capstone™ Policy – Pennsylvania" which is derived from and references Pennsylvania law throughout. Neither party disputes that Pennsylvania law applies in this case. (ECF No. 1, ¶ 7); (ECF No. 11, ¶ 7).

5

appraisal clause becomes mandatory, and the other party must select an appraiser. *Professional, Inc. v. Mut. Ben. Ins. Co.*, 2020 WL 6743978, at *6 (Pa. Super. 2020).

Cincinnati does not dispute that it is obligated to pay the full replacement cost of the property pursuant to the Guaranteed Replacement Cost Provision. (ECF No. 24, p. 5); (ECF No. 1, ¶ 13); (ECF No. 11, ¶ 13). To date, Cincinnati has already paid Welsh $2,520,891.17 in connection with the claim at issue. (ECF No. 1, ¶ 13). Welsh does not dispute this fact. Cincinnati and Welsh dispute the amount of physical loss to the property; Welsh believes the total replacement cost to be approximately $3,251,761, while Cincinnati believes the replacement cost to be the $2,520,891.17 that it has already paid to Welsh. Since Cincinnati has admitted and accepted liability under the Policy, there is a clear dispute regarding the total amount of loss and replacement costs. Cincinnati has also demanded appraisal. Thus, the Policy's Appraisal provision has become mandatory, per Pennsylvania law. Cincinnati raises a valid claim under Pennsylvania law and, therefore, declaratory relief will be granted and judgment will be entered in Cincinnati's favor. Welsh must submit to the Policy's Appraisal provision and move forward with selecting an appraiser.

**B. Judgment will be entered in favor of Cincinnati as to Welsh's counterclaim.**

Welsh brings his bad faith counterclaim pursuant to 42 Pa. C.S. § 8371. He contends that Cincinnati has consistently delayed providing him with information and that when he was provided with information, it was inaccurate and in need of correction. (ECF No. 11, ¶ 61). He contends that Cincinnati has taken inconsistent positions, that its bids were based on inadequate plans, and that Cincinnati incorrectly calculated the Additional Living Expense Coverage. (*Id.* ¶¶ 63, 65, 81). Welsh further contends that Cincinnati has no good faith basis to dispute his bid for replacements costs, that its refusal to authorize the demolition and reconstruction of the

6

property under the Guaranteed Replacement Cost Provision without invoking appraisal is frivolous and unfounded, and that it has no reasonable basis for denying full payment of the replacement costs under the Guaranteed Replacement Cost Provision. (*Id.* ¶¶ 69, 70, 72).

42 Pa. C.S. § 8371 states that "in an action arising under an insurance policy, if the court finds that an insurer has acted in bad faith toward the insured, the court may take all of the following actions: 1) award interest on the amount of the claim from the date the claim was made by the insured in an amount equal to the prime rate of interest plus 3%, 2) award punitive damages against the insurer, or 3) assess court costs and attorney fees against the insurer." In the insurance context, the term "bad faith" has acquired a particular meaning:

> "Bad faith" on part of the insurer is any frivolous or unfounded refusal to pay proceeds of a policy; it is not necessary that such refusal be fraudulent. For purposes of an action against an insurer for failure to pay a claim, such conduct imports a dishonest purpose and means a breach of a known duty (i.e., good faith and fair dealing), through some motive of self-interest or ill will; mere negligence or bad judgment is not bad faith.

*Chuplis v. State Farm Fire and Cas. Co.*, No. 3:20-CV-1757, 2021 WL 1080932, at *3 (M.D. Pa. Mar. 19, 2021) (citing *Terletsky v. Prudential Property & Cas. Ins. Co.*, 649 A.2d 680, 688 (Pa. Super. 1994)).

To recover under a claim of bad faith, the plaintiff must show that the defendant did not have a reasonable basis for denying benefits under the policy, and that the defendant knew or recklessly disregarded its lack of reasonable basis in denying the claim. *Id.* Further, in determining whether the insurer has acted in bad faith, courts may consider the insurer's delay in responding to communications from the insured, its response time in engaging an investigator and conducting an investigation, and its handling of settlement negotiations. *Polselli v. Nationwide Mut. Fire Ins. Co.*, 23 F.3d 747, 752 (3d Cir. 1994).

Welsh claims that Cincinnati consistently delayed providing him with information, relied on the Original Henchar Bid which was based solely on inadequate property plans, never provided him with a bid in the scope as the Wentzel Bid (Welsh's bid for the property reconstruction), and has no reasonable basis to deny full payment of the replacement cost under the Policy's Guaranteed Replacement Cost Provision. (ECF No. 11, ¶¶ 61, 65, 68, 72). In terms of Cincinnati's response time, the pleadings do not support a finding that Cincinnati ceased communication with Welsh for multiple months or caused any severe delays. After the fire occurred on February 1, 2023, Welsh submitted his initial bid/good faith estimate to Cincinnati on April 18, 2024. (ECF No. 23, p. 3). Cincinnati responded to Welsh with its own bid, the "Original Henchar Bid" from Wayne J. Henchar Custom Construction, on June 5, 2024. (*Id.*). Cincinnati then learned from Henchar that this Original Bid was an inadequate estimate and proceeded to submit an updated bid to Welsh on July 25, 2024. (*Id.* at 4). From the time of the fire, Welsh took two and a half months to respond to Cincinnati's initial request for a bid. Cincinnati took less than that amount of time when submitting its bids in response to Welsh.

Concerning full payment of the replacement cost under the Policy's Guaranteed Replacement Cost Provision, Welsh makes a circular and unconvincing argument that Cincinnati does not need the appraisal process to pay him the full replacement cost. As Cincinnati has aptly highlighted, it demanded appraisal to obtain a final determination of the "full replacement cost," because the amount is in dispute, so that it may make the appropriate payment to Welsh. (ECF No. 24, p. 5). Cincinnati further points out that there is no requirement that the repairs be complete to trigger the Policy's Guaranteed Replacement Cost Coverage, but rather, the focus is on whether the "amount of physical loss to the dwelling" exceeds the insured's applicable Limit of Insurance. (*Id.*). Welsh acknowledges that a dispute clearly exists as to the amount of

physical loss and total replacement cost by the very fact that he remains unsatisfied with the amount he has received thus far from Cincinnati. (ECF No. 11, ¶ 13); (ECF No. 14, ¶ 3). Appraisal will resolve this dispute. If the appraisal process determines that the amount of physical loss exceeds the Policy's Limit of Insurance, Cincinnati has conceded that the Guaranteed Replacement Cost Coverage provision will ensure that additional funds are available to Welsh to make any necessary repairs. (ECF No. 24, p. 6). This concession does not demonstrate any dishonest purpose, ill-will, or self-interested action on Cincinnati's part. Rather, it displays the exact opposite.

Nothing in the record demonstrates that Cincinnati did not have a reasonable basis for denying benefits under the policy, or that Cincinnati knew or recklessly disregarded its lack of reasonable basis in denying the claim. Not only has Cincinnati not denied Welsh benefits, Cincinnati has simply asked for the matter to proceed to appraisal so that it can pay Welsh more than the $2,520,891.17 it already has if the appraisal exceeds the Policy's limit. Welsh has come forth with no evidence to support a viable claim for bad faith. The Court will enter judgment on the pleadings in favor of Cincinnati as to Welsh's counterclaim.

### IV. CONCLUSION

For the foregoing reasons, the Court will grant Cincinnati's Motion for Judgment on the Pleadings. (ECF No. 14). Orders of Court will follow. Welsh must name a competent and impartial appraiser and fully participate in the appraisal process as required by the Policy.

BY THE COURT:

_____
WILLIAM S. STICKMAN IV
UNITED STATES DISTRICT JUDGE

5/20/25
_____
Dated

9